## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

### CASE NO. 08-21428-CIV-ALTONAGA/Brown

**PAUL BABINEAU**, *et al.*,

        Plaintiffs,

vs.

**FEDERAL EXPRESS CORPORATION**,

        Defendant.

_____/

### ORDER ON MOTION FOR CLASS CERTIFICATION

**THIS CAUSE** came before the Court for a hearing on September 19, 2008, upon Plaintiffs'

Motion for Class Certification ("Motion") [D.E. 20], filed on August 15, 2008.  Plaintiffs move for

class certification pursuant to Rule 23 of the Federal Rules of Civil Procedure.  The undersigned has

carefully considered the parties' written submissions, oral arguments by counsel, and pertinent

portions of the record.

## I. BACKGROUND

This case arises from alleged corporate policies regarding the payment of hourly employees

of Defendant, Federal Express Corporation ("FedEx").  The undersigned considered and denied a

substantially similar motion for class certification in *Clausnitzer v. Federal Express Corporation*,

248 F.R.D. 647 (S.D. Fla. 2008).  In *Clausnitzer*, the plaintiffs sought certification of a nationwide

class of FedEx employees on a breach of contract claim.  The FedEx policies and practices

underlying Plaintiffs' claims in this case are identical to those considered in *Clausnitzer*.  Plaintiffs

in this case seek certification of a class of Florida employees rather than a nationwide class.  They

also seek certification of a claim in *quantum meruit* in addition to their claim for breach of contract.

Case No. 08-21428-CIV-ALTONAGA/Brown

Because of the similarities between this case and *Clausnitzer*, the undersigned borrows heavily from the construction of the factual background in that case.[1]

### A.      Plaintiffs' Claims

Plaintiffs, a group of hourly FedEx employees, brought the instant action against FedEx alleging the company engaged in a pervasive and long-standing policy of failing to pay hourly employees for all time worked.   Plaintiffs purport to represent a class of "[a]ll employees of defendant paid on an hourly basis as nonexempt employees . . . employed in the state of Florida, from the maximum time period preceding the filing of this complaint, as permitted by the statute of limitation, until such time as the Class period closes."[2]  (*See Complaint* (*"Compl."*) [D.E. 1] at ¶ 14).

Plaintiffs allege three causes of action: (1) breach of contract for non-payment of wages owed (*see id.* at ¶¶ 39-46); (2) a claim in *quantum meruit* for services rendered (*see id.* at ¶¶ 47-55); and (3) a claim for unjust enrichment (*see id.* at ¶¶ 56-63).   Class certification is sought with respect to the claim for breach of contract and the claim in *quantum meruit*.   (*See Motion* at 3).   According to Plaintiffs, FedEx breached its contractual obligation to compensate them, and they conferred a benefit on FedEx for which they were not paid by failing to pay for three categories of time worked: (1) time worked between arriving at a FedEx facility and the scheduled start time; (2) time worked

---

[1]  The parties also rely almost exclusively on evidence obtained through discovery in *Clausnitzer* as well as in *Foster v. FedEx*, Case No. BC 282300 (Cal. Sup. Ct.), a similar class action filed by Plaintiffs' counsel in California state court, which ultimately settled after a class was certified.

[2]  More specifically, Plaintiffs' proposed class includes "couriers, courier/handlers and service agents, and any other non-exempt employee who is, or was, required during the class period to punch in and out on a manual time clock, but was paid only from scheduled start time to scheduled end time.  The class also includes those employees who worked during unpaid breaks."  (*See Motion* at 2).

Case No. 08-21428-CIV-ALTONAGA/Brown

between the scheduled stop time and leaving a FedEx facility; and (3) time worked during unpaid breaks.  (*See Compl.* at ¶ 19; *Motion* at 4).

**B.      The Factual Record Developed for Class Certification**

1.      Employment Relationship Between Plaintiffs and FedEx

Plaintiffs assert that the employment relationship existing between the parties arises from an express contract under Florida law.  (*See Compl.* at ¶ 15; *Motion* at 4-5).  They claim the contract is embodied in several documents, including a signed employment agreement and FedEx employment manuals.

Each potential member of the class signed an employment agreement upon beginning the employment application process with FedEx.  (*See, e.g.*, *Employment Agreement, Affidavit of Gwen Freeman* ("*Freeman Aff.*") Exh. F [D.E. 20-3]; *Employment Agreements, Affidavit of Andre E. Jardini* ("*Jardini Aff.*") Exh. 48 [*Clausnitzer* D.E. 56-26]).  The main purpose of these agreements was to protect FedEx during the process of vetting potential employees.  (*See id.*).  Every employment agreement contains a clause specifying that the nature of the employment relationship between FedEx and the employee is at-will.  (*See id.*).  There were a number of different versions of the employment agreement signed by employees over the years; most material terms were consistent, but some agreements included provisions regarding alternative dispute resolution procedures and a clause specifying a 6-month limitation period on filing suit.  (*See, e.g.*, *Employment Agreements, Jardini Aff.* Exh. 48 at 626, 628-29).  Plaintiffs point to a provision of the agreement in which the employee agrees, "all terms and conditions of my employment . . . shall be determined and governed by Companies' Policies and Procedures Manual . . . ." (*Motion* at 5).  Plaintiffs assert

3

Case No. 08-21428-CIV-ALTONAGA/Brown

this clause incorporates FedEx's employment manuals into the alleged contract.

FedEx provided employees copies, or gave them access to, various company employment manuals, including an "Employee Handbook" and a "People Manual." Both the Employee Handbook and the People Manual explicitly disclaim that their respective terms create contractual rights. (*See id.*; *Decl. of Leila Hassan* ("*Hassan Decl.*") Exh. 3 [*Clausnitzer* D.E. 61-3]). Employees signed a receipt accompanying the Employee Handbook acknowledging that the Handbook does not create a contract. (*See, e.g., Exh. 5 to Clausnitzer Dep., Hassan Decl.* Exh. 18 [*Clausnitzer* D.E. 61-6]).

Section 3-92 of both the Employee Handbook and the People Manual states, "[i]t is the policy of FedEx Express to compensate employees for all time worked in accordance with applicable state and federal laws." (*See Freeman Aff.* Exh. G [D.E. 20-3]). In the People Manual, the next sentence states, "[e]xcept for certain approved preliminary and post-liminary activities, no employee should perform work 'off the clock' for any reason, whether on their own initiative or at the request of management." (*See Jardini Aff.* Exh. 55 [*Clausnitzer* D.E. 56-29] at 743). Plaintiffs assert the statement regarding FedEx's compliance with federal law incorporates federal regulations into the alleged contract. Plaintiffs contend the definition of "hours worked" under certain federal regulations governs the question of compensable hours under the alleged contract.

FedEx disputes that an express contractual relationship between it and the Plaintiff employees exists. (*See Memo. in Opposition* ("*Opposition*") [D.E. 23] at 4-6). Instead, FedEx maintains that Plaintiffs are employed at-will, and the employment agreements and provisions of the Employee Handbook and People Manual relied on by Plaintiffs do not create contractually

4

Case No. 08-21428-CIV-ALTONAGA/Brown

enforceable obligations.  (*See id.*).

### 2.    FedEx's Monitoring of Employees' Time

Plaintiffs' ability to show the viability of their claims hinges on evidence produced from FedEx's systems of recording employees' time.  FedEx maintained two primary systems for tracking employees' activities and documenting time.[3]  (*See Motion* at 12; *Opposition* at 2-3).  First, FedEx recorded time electronically by requiring employees to use electronic devices known as Trackers, SuperTrackers, and PowerPads (collectively "Tracker[s]").  (*See id.*).  During the day or at the end of the day, employees manually entered task codes into the Tracker to correspond to activities performed at a given time.  (*See id.*).  These manually entered work codes documented when the employee began work, started and finished a break, and ended work for the day.  (*See id.*).  The information was later transmitted to the FedEx employee time database ("FAMIS") and used by the payroll department to process paychecks.  (*See id.*).

Because employees controlled the manual entry of work codes into the Tracker and because these entries were not automatically time stamped, FedEx has stated the data contained in the FAMIS system did not always accurately reflect a particular employee's activities at a specific moment during the day.[4]  Trackers were also used by employees to record stops and scan packages at pick-ups and deliveries.  FedEx compiled the data to improve the efficiency of deliveries, track packages, and

---

[3]  The parties also mention a third manner of tracking time that involved employees writing task codes on their time cards to correspond to tasks performed.  (*See Motion* at 12).

[4]  According to FedEx, a study conducted by its engineers found that over 40% of all break codes were entered by employees after the employee actually took the break, although this practice was discouraged.  (*See Opposition* at 17 n.9 (citing *Dep. of S. Healy, Hassan Decl.* Exh. 36 [*Clausnitzer* D.E. 61-9] at 93)).

Case No. 08-21428-CIV-ALTONAGA/Brown

ensure that customers received packages on schedule.

The second method of controlling employees' time was through a traditional punch clock system. (*See Motion* at 12; *Opposition* at 3). FedEx required employees to punch a card through a time clock when arriving at the FedEx facility and when leaving the facility at the end of the work day. (*See id.*). Employees sometimes arrived at the FedEx facility and punched their cards before the scheduled start time, and likewise left the facility and punched the cards after their scheduled end time.[5] (*See id.*). It is undisputed, however, that employees were only compensated for the time between the scheduled starting and ending times as entered into the Trackers, which did not necessarily coincide with the manual punch-in and punch-out times. (*See Motion* at 12-13).

3.     Work Occurring During Gap Periods

According to Plaintiffs, it was FedEx's corporate policy that employees were required to perform certain work functions during the "gap periods" between punching in and the scheduled start time, and between the scheduled end time and punching out for the day. (*See id.* at 13). Thus, Plaintiffs assert that employees were required to perform work during time periods when they were not being paid. (*See id.*). The activities allegedly performed during these unpaid periods vary according to the job function of the particular employee and include gathering equipment and supplies, finishing paperwork, restocking, running reports, and completing closing procedures. (*See id.* at 12). Plaintiffs offer their own declarations and depositions and the deposition testimony of other employees for the proposition that work was performed during these gap periods.

_____

[5]   Subsequent to the initiation of litigation regarding the facts underlying Plaintiffs' claims, FedEx implemented a policy requiring employees to punch their cards within five minutes of beginning and ending their shifts instead of when arriving and leaving the FedEx facility.

6

Case No. 08-21428-CIV-ALTONAGA/Brown

Plaintiff, Paul Babineau, has been employed by FedEx for 25 years as a courier, and he stated that during the beginning of shift gap periods he performed duties for which he was not paid. (*See Decl. of P. Babineau, Freeman Aff.* Exh. A [D.E. 20-3] at ¶ 9). According to Babineau, during the end of day gap periods, "additional day end duties were frequently performed." (*Id.* at ¶ 10). Plaintiff, Kenny Bosley, is a courier/handler and stated he spent "time gathering [his] equipment and preparing to work [his] route" during the beginning of shift gap periods. (*Decl. of K. Bosley, Freeman Aff.* Exh. B [D.E. 20-3] at ¶ 7). Similarly, Plaintiff, Larry Horton, stated the work he and other couriers performed during the beginning of shift gap periods "included getting equipment, truck keys, going to [the] truck, participating in a meeting if a meeting was scheduled, and other kinds of pre-trip activities . . . ." (*Decl. of L. Horton, Freeman Aff.* Exh. C [D.E. 20-3] at ¶ 9).

Plaintiffs also cite the affidavits of statistician, Dr. Richard Drogin, who reviewed and analyzed a sample of employee time data obtained from FedEx in *Clausnitzer.* (*See Motion* at 14 n.2 (citing *Aff. of R. Drogin* ("*Drogin Aff.*") [*Clausnitzer* D.E. 56-3]; *Suppl. Aff. of R. Drogin* [*Clausnitzer* D.E. 66-2])). Dr. Drogin's study compared employee time records from the FAMIS database to the time records recorded by manual punch cards. He found that, on average, each employee's records reflected an 8.1 minute gap period each day. (*See Drogin Aff.* ¶ 6). Plaintiffs claim all gap periods of every potential class member constitute unpaid work. (*See Motion* at 13-14).

The record does not contain any evidence of an explicit FedEx policy requiring employees to work during gap periods. To the contrary, FedEx's policies explicitly prohibited employees from performing work off-the-clock. (*See People Manual, Jardini Aff.* Exh. 55 at 743). FedEx states the punch-in and punch-out times reflected by the manual records have no bearing on the actual time

7

Case No. 08-21428-CIV-ALTONAGA/Brown

worked by employees. (*See Opposition* at 3). FedEx explains that it was the published policy of the company (understood by employees) that manual punch times did not correspond to the time for which employees would receive compensation. (*See id.* (citing depositions)). The company points to depositions and declarations of employees, including some of the representative Plaintiffs, for the proposition that the gap periods were employees' personal time and that employees understood they would not be paid during the gap periods. (*See id.* at 3-4). Bosley, for example, stated he always understood he would be paid based on the scheduled times rather than the manual punch times. (*See Bosley Deposition, Opposition* Exh. 6A-6C [D.E. 23-8, 9, 10] at 32:18-22, 33:17-22, 94:25-95:8).

As FedEx noted in *Clausitzer* and here, there are many individualized reasons unrelated to the completion of work that employees may have arrived at the facility before the scheduled start time or left the facility after the scheduled end time. (*See Opposition* at 16-17). For example, courier Christine DeMartini stated that she sometimes arrived at work early because of "traffic patterns" or depending on when she dropped her child off at school. (*See Decl. of C. DeMartini, Hassan Decl.* Exh. 22 [*Clausnitzer* D.E. 61-7] at ¶ 7). During the period between arriving and her scheduled start time, DeMartini "may use the restroom or otherwise just get ready to start [her] work day," and she did not expect to "be paid for this time because [she was] not working." (*Id.*). Similarly, courier Steve Lake testified that he typically arrived ten minutes before his starting time because he "didn't like to rush." (*Dep. of S. Lake, Hassan Decl.* Exh. 44 [*Clausnitzer* D.E. 61-11] at 24). During that time he would "talk to people and have a cup of coffee and relax." (*Id.*). Furthermore, FedEx contends, and certain Plaintiffs have confirmed, there was never a requirement that employees arrive early and punch their time cards before the scheduled start time. (*See*

Case No. 08-21428-CIV-ALTONAGA/Brown

*Opposition* at 3 (citing *Bosley Dep.*; *Request for Admissions, Hassan Decl.* Exh. 19 [*Clausnitzer* D.E. 61-6] at ¶¶ 44-45)).

With respect to the end of day gap periods, FedEx cites to similar individual reasons developed through employees' declarations and depositions. (*See id.* at 21). Courier Cesar Oyague stated that during the end of day gap period he "may stop to talk to coworkers" but did not "expect to be paid for this time because [he was] not working." (*Decl. of C. Oyague, Hassan Decl.* Exh. 55 [*Clausnitzer* D.E. 61-12] at ¶ 9). FedEx asserts the reason employees were required to punch-in manually in addition to the electronic system was "to prevent falsification of tracker entries, which the employees control." (*Opposition* at 3 (citing *Bosley Dep.*)).

FedEx highlights testimony elicited from Bosley wherein he stated he was never directed by FedEx managers to work off-the-clock nor did he know of any FedEx managers who were aware he worked off-the-clock. (*See id.* at 1 (citing *Bosley Dep.*)). Bosley also testified that he never requested permission to punch-in early when he believed he had too much work to complete. (*See id.*). Bosley stated the amount of time he spent working during the gap periods varied. (*See id.*).

As the undersigned noted in *Clausnitzer*, FedEx's expert, Dr. Michael P. Ward, conducted a study similar to Dr. Drogin's and found the statistics provided by Dr. Drogin disproportionately reflect the long gap periods of a concentrated group of employees. (*See id.* at 17-18; *Decl. of M. Ward* ("*Ward Decl.*")*, Hassan Decl.* Exh. 69C [*Clausnitzer* D.E. 61-16] at ¶¶ 11-13). Regarding beginning of shift gaps, Dr. Ward found the median gap period of the data sample was 4 minutes, while the average was 9 minutes; and with respect to the end of shift gap period, the median was 0 minutes and the average was 2.7 minutes. (*See Ward Decl.* at ¶¶ 11-12). Dr. Ward concluded that

9

Case No. 08-21428-CIV-ALTONAGA/Brown

Dr. Drogin's average "is not an informative statistic because it masks the large difference between morning and evening and because it is greatly influenced by a relatively small number of cases where the [gap period] is inexplicably long." (*Id.* at ¶ 13).

4.    Work Occurring During Unpaid Breaks

As mentioned, employees recorded break periods by entering the appropriate task codes into the Tracker.  Until recently, an employee was able to scan packages and enter other codes during the time period when the Tracker was in the break task code.  It was possible for FedEx management to compare a report of break times with a report indicating scans to discover whether employees were scanning packages and making stops during their breaks.  FedEx did not regularly undertake this comparison, instead relying on employees to inform managers if it became necessary to work during a break.

Plaintiffs assert that working during breaks was a regular occurrence at FedEx.  (*See Motion* at 4).  They state that by comparing the various reports, the company was able to discover that employees were working during breaks, and thus FedEx had knowledge of the work, approved it, and permitted it to continue.  (*See id.* at 11).  Plaintiffs submit declarations and depositions of various employees indicating they regularly worked during breaks.  (*See Jardini Aff.* at ¶¶ 150, 152-53, 155-56, 159 (citing declarations and depositions)).  Babineau, Bosley, and Horton stated they worked during unpaid breaks.  (*See Babineau Decl.* at ¶¶ 14-15; *Bosley Decl.* at ¶ 15; *Horton Decl.* at ¶ 14).  To prove the frequency of this work, Plaintiffs again offer the study of Dr. Drogin completed for the *Clausnitzer* case.  (*See Motion* at 2).  Dr. Drogin's analysis compared a sample of time records from the FAMIS database with records of package and stop scans and concluded 17.6%

10

Case No. 08-21428-CIV-ALTONAGA/Brown

of unpaid breaks were interrupted by scans.[6]  (*See id.*; *Drogin Aff.* at ¶ 7).

FedEx argues that employees were explicitly told not to work during unpaid breaks and cites documentation of this policy.  (*See Employee Handbook, Jardini Aff.* Exh. 47 [*Clausnitzer* D.E. 56-24] at 591).  The company also points to statements of employees indicating they did not work during unpaid breaks and that they understood the company policy prohibited such work.  (*See Opposition* at 6 (citing depositions of *Clausnitzer* plaintiffs Bost and Ortiz)).  For example, Frederick Ortiz testified he did not work during unpaid lunch breaks.  (*See Dep. of F. Ortiz, Hassan Decl.* Exh. 54 [*Clausnitzer* D.E. 61-12] at 26).  Anthony Bost testified he did not work during breaks out of a concern that he might "get hurt."  (*See Dep. of A. Bost, Hassan Decl.* Exh. 9 [*Clausnitzer* D.E. 61-4] at 113-14).  Bost stated, "I do it right.  When I'm off . . . I don't do anything."  (*Id.*).  Bosley also testified he was aware of FedEx policy prohibiting employees from working during unpaid breaks and that he in fact requested and was granted permission to work during unpaid breaks on several occasions.  (*See Bosley Dep.* at 37:1-39:16).

With respect to the statistical data, FedEx contends Dr. Drogin's study fails to take into account several factors that significantly reduce the number of interrupted breaks.  (*See Opposition* at 16).  Dr. Ward's study yielded a 9.4% interruption rate after excluding interrupting scans occurring in the first and last minute of the break period and also found that the group of employees in the top 10% in terms of frequency of interrupted breaks accounted for 47.7% of all interrupted breaks. (*See Ward Decl.* at ¶¶ 16, 23).  Furthermore, Dr. Ward noted that the named plaintiffs in *Clausnitzer* for

---

[6] Dr. Drogin states that during the period of his study, 564,428 of 3,202,113 unpaid breaks were interrupted by work activities.  (*See Drogin Aff.* at ¶ 7).  This is a 17.6% interruption rate.

Case No. 08-21428-CIV-ALTONAGA/Brown

whom records were analyzed have "nominal rates of scans [during breaks] ranging from 1.3% to 2.4%." (*Opposition* at 17). The records of *Clausnitzer* plaintiff Ortiz, however, who testified he never worked during breaks, actually show the highest instance of interrupting events among the named plaintiffs in that case. In *Clausnitzer*, and presumably here as well, FedEx postulated the FAMIS records may inaccurately reflect the exact times when breaks occurred because employees input break codes into the system at the end of the day and may have inadvertently created an overlap between a scan and break time.

Dr. Ward also reviewed a sample of time records for the four named Plaintiffs in this case. (*See Decl. of M. Ward, Sept. 2, 2008* [D.E. 23-5]). Dr. Ward found that Plaintiffs, Babineau and Bosley, had a significantly higher rate of interrupted breaks than Plaintiffs, Horton and Duane Joyce, who had nominal rates of interruptions. (*See id.*). FedEx also points out that Bosley acknowledged he has no way of estimating how much time he spent working during unpaid breaks. (*See Bosley Dep.* at 114:18-25).

## II. CLASS CERTIFICATION ANALYSIS

"Questions concerning class certification are left to the sound discretion of the district court." *Cooper v. Southern Co.*, 390 F.3d 695, 711 (11th Cir. 2004) (citing *Armstrong v. Martin Marietta Corp.*, 138 F.3d 1374, 1386 (11th Cir. 1998); *Freeman v. Motor Convoy, Inc.*, 700 F.2d 1339, 1347 (11th Cir. 1983)). With this "great power comes great responsibility; the awesome power of a district court must be 'exercised within the framework of [Federal Rule of Civil Procedure] 23.'" *Klay v. Humana, Inc.*, 382 F.3d 1241, 1251 (11th Cir. 2004) (quoting *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 740 (5th Cir. 1996)).

12

Case No. 08-21428-CIV-ALTONAGA/Brown

A plaintiff seeking certification of a claim for class treatment must propose an adequately defined class that satisfies the requirements of Rule 23, Federal Rules of Civil Procedure.  These requirements are frequently denominated "'the prerequisites of numerosity, commonality, typicality and adequacy of representation,' and they are designed to limit class claims to those 'fairly encompassed' by the named plaintiffs' individual claims." *Piazza v. Ebsco Indus., Inc.*, 273 F.3d 1341, 1346 (11th Cir. 2001) (quoting *Gen. Tel. Co. of S.W. v. Falcon*, 457 U.S. 147, 156 (1982)). Rule 23(a) provides that class certification is only appropriate where:

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims and defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

The plaintiff class must also satisfy one of the three additional requirements of Rule 23(b). "For a district court to certify a class action, the named plaintiffs must have standing, and the putative class must meet each of the requirements specified in Federal Rule of Civil Procedure 23(a), as well as at least one of the requirements set forth in Rule 23(b)." *Klay*, 382 F.3d at 1250 (citations omitted).  Plaintiffs assert that the proposed class is certifiable under either Rule 23(b)(1) or 23(b)(3). (*See Motion* at 14).  Under Rule 23(b)(1), the court may certify if "prosecuting separate actions . . . would create a risk of inconsistent or varying adjudications . . . that would establish incompatible standards of conduct for the party opposing the class." Fed. R. Civ. P. 23(b)(1)(A).[7]  A Rule 23(b)(3) class requires the court to find "that the questions of law or fact common to class members

---

[7]  Plaintiffs assert their proposed class is proper under Rule 23(b)(1)(A) but make virtually no arguments with respect to this assertion.  Therefore, the propriety of certification under this provision is not considered here, although it would appear to be improper for the same reasons expressed in *Clausnitzer*. *See Clausnitzer*, 248 F.R.D. at 662-63.

13

Case No. 08-21428-CIV-ALTONAGA/Brown

predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

In examining whether the party seeking certification has met the requirements of Rule 23, the court should not consider the merits of the proponents' claims. *See Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177-78 (1974). The Eleventh Circuit, however, has counseled that this principle is not to be applied blindly so as "to artificially limit a trial court's examination of the factors necessary to a reasoned determination of whether a plaintiff has met [the] burden of establishing each of the Rule 23 class action requirements." *Love v. Turlington*, 733 F.2d 1562, 1564 (11th Cir. 1984).

In *Clausnitzer*, plaintiffs met their burden of demonstrating the numerosity, commonality, typicality, and adequacy of representation requirements of Rule 23(a). However, certification was ultimately denied because (1) plaintiffs' proposed class was not adequately defined; and (2) plaintiffs failed to satisfy the predominance requirement of Rule 23(b), because (a) plaintiffs' sweeping nationwide breach of contract claim was overly simplistic and failed to account for a variety of legal issues that must be addressed in determining the nature and terms of the alleged contracts between FedEx and the plaintiff employees in the various covered jurisdictions; and (b) class treatment would have glossed over countless individual factual inquiries necessary to properly adjudicate whether work was actually being performed during gap periods and unpaid breaks.

FedEx argues Plaintiffs are collaterally estopped from seeking certification of a Florida class of employees because the issue was previously decided in *Clausnitzer*. FedEx contends the class

14

Case No. 08-21428-CIV-ALTONAGA/Brown

issues raised by the present Motion are substantially similar to those raised in *Clausnitzer*, and Plaintiffs in this case are in privity of interest with the *Clausnitzer* plaintiffs because they were potential members of the class in that case. Consequently, FedEx urges the certification question is controlled by the outcome in *Clausnitzer*. *See Frosini v. Bridgestone Firestone N. Am. Tire, LLC*, No. 05-cv-0578, 2007 WL 2781656, at *9-10 (C.D. Cal. Aug. 24, 2007) (denying certification of a state class on grounds of collateral estoppel following the denial of a substantially similar nationwide class by another court in a prior case). While FedEx's argument likely has merit, at least with respect to the breach of contract claim, even if Plaintiffs are not collaterally estopped from obtaining certification, the class fails to meet the requirements of Rule 23 and is not appropriate for certification.

Among other arguments, FedEx asserts certification should be denied because the named Plaintiffs are inadequate to represent the class, the potentially conflicting law of various jurisdictions applicable to Plaintiffs' claims will predominate over common questions, and because there exist problems with respect to the viability of Plaintiffs' breach of contract claim. Setting these arguments aside, however, Plaintiffs have failed to allay the Court's concern in *Clausnitzer* regarding the individual factual inquiries necessary to determine whether potential class members actually worked during the gap periods and during unpaid breaks, and this alone is reason enough to deny certification. Here, as in *Clausnitzer*, adjudication of Plaintiffs' claims on a class basis would be swamped by individual factual inquiries into the activities of each employee during the gap periods or during breaks.

For purposes of this Order, the undersigned assumes Plaintiffs can establish the other

15

Case No. 08-21428-CIV-ALTONAGA/Brown

requirements for certification of their class.  As stated, however, and as further explained below, because Plaintiffs have failed to adequately show that individual factual inquiries will not predominate over common questions of fact, Plaintiffs' proposed class fails to meet the requirements of Rule 23(b).

### The proposed class does not satisfy the requirements of Rule 23(b).

Plaintiffs principally advance that certification is proper under Rule 23(b)(3).  To achieve certification under Rule 23(b)(3), the plaintiff class must demonstrate both that common questions of law or fact predominate over inquiries affecting individual class members, and that the class procedure is superior to other methods of adjudicating the claims.  The "predominance criterion [under Rule 23(b)(3)] is far more demanding" than the commonality requirement of Rule 23(a). *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623-24 (1997).

In a properly certified Rule 23(b)(3) class, "'the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, must predominate over those issues that are subject only to individualized proof.'" *Jackson v. Motel 6 Multipurpose, Inc.*, 130 F.3d 999, 1005 (11th Cir. 1997) (quoting *Kerr v. City of West Palm Beach*, 875 F.2d 1546, 1557-58 (11th Cir. 1989)).  "Common issues of fact and law predominate if they 'ha[ve] a direct impact on every class member's effort to establish liability and on every class member's entitlement to injunctive and monetary relief.'"  *Klay*, 382 F.3d at 1255 (quoting *Ingram v. Coca-Cola Co.*, 200 F.R.D. 685, 699 (N.D. Ga. 2001)).  "Common issues will not predominate over individual questions if, 'as a practical matter, the resolution of . . . [an] overarching common issue breaks down into an unmanageable variety of individual legal and factual issues.'"  *Cooper*, 390 F.3d at 722 (quoting *Andrews v. Am.*

16

*Tel. & Tel. Co.*, 95 F.3d 1014, 1023 (11th Cir. 1996)).  Certification is inappropriate in the event that "plaintiffs must still introduce a great deal of individualized proof or argue a number of individualized legal points to establish most or all of the elements of their individual claims." *Klay*, 382 F.3d at 1255 (citing *Perez v. Metabolife Int'l, Inc.*, 218 F.R.D. 262, 273 (S.D. Fla. 2003)).

The predominance inquiry requires an examination of "'the claims, defenses, relevant facts, and applicable substantive law,' . . . to assess the degree to which resolution of the classwide issues will further each individual class member's claim against the defendant." *Id.* at 1254 (quoting *Castano*, 84 F.3d at 744).  With respect to the predominance of individual factual issues over common questions of fact, the undersigned found the following in *Clausnitzer*:

> Plaintiffs contend that the issue of whether FedEx had a company-wide policy of not compensating hourly employees for all time worked is a common question of fact that predominates over individual inquiries.  However, as noted by FedEx, the time records produced by FedEx as well as the statistical analysis completed by Dr. Drogin do not indicate whether employees were actually working during gap periods.  Indeed, testimony from employees, including named Plaintiffs, supports the conclusion that employees may have been engaged in a variety of non-work related activities during some of the gap periods.  With respect to work during unpaid breaks, FedEx has shown many individual reasons why a scan could have occurred while the employee was recording a break code, and has also shown that such scans were not frequent among a substantial majority of employees.   Two similar cases provide guidance on this factual predominance inquiry.

> In *Basco v. Wal-Mart Stores, Inc.*, 216 F. Supp. 2d 592 (E.D. La. 2002), the court considered certification of a class of hourly Louisiana employees alleging Wal-Mart breached its contract with them by failing to pay for time worked off-the-clock.  The court found predominance of factual inquiries regarding off-the-clock work lacking, because "individualized issues will arise from the myriad of possibilities that could be offered to explain why any one of the plaintiffs worked off-the-clock." *Id.* at 603.  These individual questions included, for example, whether the employee did in fact work, whether the employee unreasonably failed to seek compensation for the off-the-clock work

performed, and whether the employee knew of Wal-Mart's policy prohibiting off-the-clock work and chose to engage in it anyhow. *Id.* The *Basco* plaintiffs endeavored to "cure the individualized nature of their contract and 'work off-the-clock' claims, in part, by employing statistical analysis to determine the global number of rest and meal breaks taken by employees and the number of hours worked off-the-clock for the entire Wal-Mart workforce in Louisiana during a period of time." *Id.* The court found the statistical studies based on employee time records offered by the plaintiffs "ignor[ed] the highly individualized issues involved in the case," such as reasons for employees missing or working during breaks and defenses available to Wal-Mart justifying or explaining the work. *Id.* The court also noted that the use of representational samples by plaintiffs to prove damages "would deprive defendants of their right to have a jury determine liability and damages as to each plaintiff and fly in the face of established contract law." *Id.* at 604.

Similarly, in *Cornn v. United Parcel Service, Inc.*, No C03-2001, 2005 WL 2072091 (N.D. Cal. Aug. 26, 2005), the court denied certification of a class of hourly United Parcel Service ("UPS") workers asserting they were not paid for work performed in a beginning shift gap period identical to the period alleged in this case. Although the plaintiffs in *Cornn* did not bring their claim as a breach of contract, given the factual similarity between FedEx's and UPS' policies, the court's discussion with respect to predominance is highly instructive. In *Cornn*, UPS had a policy substantially similar to FedEx's, requiring hourly employees to punch-in before the scheduled start time, but only compensating employees beginning at the scheduled start time. *Id.* at *1. The *Cornn* plaintiffs asserted they performed work activities during the gap periods, such as changing into uniforms, gathering equipment, and loading packages onto cars. *Id.* at *2. They attempted to substantiate their claim through time records as well as the testimonial evidence of a group of employees.

The court found that the evidence supporting certification did not demonstrate a

> common practice among package-car drivers as to when they punch in to work. Some drivers may punch in immediately after arriving at the building, while others may punch in just before their scheduled start times . . . . [D]rivers perform a variety of non-work-related tasks, such as socializing, reading the newspaper, and drinking coffee or tea, after punching in but before their scheduled start times. If a driver punched in thirty minutes prior

to his or her scheduled start time but actually did no work during
that time, then UPS's practice of calculating hours worked based
on the scheduled start time would not be unlawful.

*Id.* at *5 (internal citations omitted). The court concluded that because it could
not "determine whether a driver performed work during the interval in question
without undertaking individualized inquiries that predominate over any
common questions, class certification would be inappropriate." *Id.*

*Basco* and *Cornn* highlight the individualized nature of the factual
inquiries that would arise should this case be adjudicated as a class action.
With respect to gap period work, there are innumerable reasons why an
employee may have arrived at the FedEx facility early on any given day. While
those reasons may in fact relate to completing work, they may also relate to a
plethora of non-work activities such as socializing, checking e-mail, beating
traffic, etc. Likewise, the end of day gap periods may also have been the result
of employees staying late at the facility to engage in non-work related activities.
FedEx has offered statements and testimony of a number of employees who
have provided such plausible explanations for what occurred during the gap
periods. The statistical evidence proffered by Plaintiffs does not account for
time spent doing activities other than work and cannot alone establish that work
was performed. Permitting these claims to proceed as a class action would
deprive FedEx of the ability to explore whether an individual employee was
engaged in non-work activities during the gap period and would thus limit
FedEx's ability to properly defend the claims.

Similarly, individual issues are apparent with respect to Plaintiffs'
claimed work during unpaid breaks. Many employees, including named
Plaintiffs, stated they did not work during unpaid breaks, although their time
records indicate scans occurring during breaks. These scans could be evidence
that work was being performed during the break, but could also have been
caused by the after-the-fact entry of break codes into the electronic time system.
Moreover, in the event an employee did work during unpaid breaks, individual
inquiries would be necessary to determine the amount of time actually spent.
FedEx has explained that scanning a package can take between two and twenty
seconds depending on the complexity of the transaction. (*See Oral Argument*
at 54). However, the time records produced by FedEx and studied by
Plaintiffs' expert to develop his opinion only show the number of scans that
occurred during a break, not how long the employee was allegedly working
when the scan occurred. Determining the amount of actual work that occurred
in conjunction with the scans or whether any work was actually completed

would be an inquiry individual to each employee who had scans during unpaid breaks.

*Clausnitzer*, 248 F.R.D. at 661-62.  The undersigned observes that the above concerns regarding individualized factual inquiries are equally applicable to Plaintiffs' claim in *quantum meruit* as well as to the breach of contract claim.

Aside from arguments already rejected in *Clausnitzer*, Plaintiffs in this case make only one additional argument in attempting to satisfy the Rule 23(b) predominance requirement.  Plaintiffs assert FedEx's policies contained in the employment agreement and employee manuals, which they claim form the basis for the alleged contract, require FedEx to pay for all time employees spent "on-the-clock."  As stated, according to Plaintiffs, FedEx has incorporated federal regulations into the "contract" by including the provision in the Employee Handbook regarding compensating employees in accordance with federal law.  Plaintiffs assert the definition of "hours worked" under certain federal regulations requires FedEx to pay for all time spent "on-the-clock" irrespective of whether work is being performed.  Under Plaintiffs' theory, therefore, no individual inquiries into whether employees were actually working are necessary because FedEx agreed to pay them regardless of whether they were working.

Specifically, Plaintiffs claim various regulations implemented pursuant to the Fair Labor Standards Act ("FLSA") provide the applicable definition for "hours worked" under the alleged contract.  Under 29 C.F.R. § 4.178, "[i]n general, the hours worked by an employee include all periods in which the employee is suffered or permitted to work whether or not required to do so, and all time during which the employee is required to be on duty or to be on the employer's premises or

1fc68588ee49e269

Case No. 08-21428-CIV-ALTONAGA/Brown

to be at a prescribed workplace."  Plaintiffs also point to 29 C.F.R. § 778.223, which states

> Under the Act an employee must be compensated for all hours worked.  As a general
> rule the term 'hours worked' will include: . . . (b) all time during which an employee
> is suffered or permitted to work whether or not he is required to do so.  Thus,
> working time is not limited to the hours spent in active productive labor, but includes
> time given by the employee to the employer even though part of the time may be
> spent in idleness.

The undersigned is not persuaded FedEx's policies and procedures articulated in the various

employment manuals incorporate FLSA regulations.  Moreover, even assuming these regulations

were somehow included in FedEx policy, it is not apparent that the definitions of "hours worked"

would necessarily resolve the issue of individualized factual inquiries.  In any event, Plaintiffs'

reliance on these regulations is problematic.  Plaintiffs do not bring a claim under the FLSA but

assert that these FLSA regulations form the basis for their claims.  The FLSA creates minimum wage

and overtime obligations for employers who employ employees covered under the provisions of the

Act, and it is within that context that the regulations were enacted.  Their purpose is not to govern

the terms of an alleged employment contract, and Plaintiffs' claims are not for minimum wage or

overtime violations.  Plaintiffs' reliance on these definitions for "hours worked," therefore, is

somewhat disingenuous and may potentially cause Plaintiffs' claims to be preempted by the FLSA.

Because the undersigned does not agree that the provisions referred to by Plaintiffs are incorporated

into FedEx policy, however, the issue is irrelevant.

Plaintiffs fail to offer a viable explanation for how adjudication of their claims as a class will

not entail the type of individualized factual inquiries that will predominate over common questions,

to the extent such common questions exist.  Accordingly, Plaintiffs have not met their burden with

respect to the predominance inquiry of Rule 23(b)(3).

As in *Clausnitzer*, in light of the determination that individual issues of fact predominate over issues common among class members, class treatment here does not meet the superiority requirement of Rule 23(b)(3)(D). Rule 23(b)(3) lists various factors the court should consider in evaluating the superiority of class treatment. Most pertinent here are "the likely difficulties in managing [the] class action." Fed. R. Civ. P. 23(b)(3)(D). As explained, there are serious questions regarding the individual inquiries that should be undertaken to allow FedEx an opportunity to defend against Plaintiffs' claims. Engaging in such inquiries will cause the adjudication of the numerous potential class members' claims to become unmanageable, burdensome, and will unreasonably tax scarce judicial resources. Due to these individual issues, proceeding with this case as a class action is not the superior vehicle for litigating potential class members' claims.

### III.  CONCLUSION

For the foregoing reasons, it is **ORDERED AND ADJUDGED** that Plaintiffs' Motion for Class Certification **[D.E. 20]** is **DENIED**.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 2nd day of October, 2008.

*Cecilia M. Altonaga*

**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

Copies provided to:
(1) Magistrate Judge Stephen T. Brown
(2) Counsel of record